# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JEROME FRANCIS GALGOCI,      :      CIVIL NO.: 1:23-cv-01530
                             :
         Plaintiff,          :      (Magistrate Judge Schwab)
                             :
    v.                       :
                             :
                             :
COMMISSIONER OF              :
SOCIAL SECURITY,             :
                             :
         Defendant.          :

## MEMORANDUM OPINION

### I. Introduction.

In this social security action, Plaintiff Jerome Francis Galgoci seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits under Title II of the Social Security Act.  We have jurisdiction under 42 U.S.C. § 405(g).  For the reasons set forth below, we will vacate the Commissioner's decision and remand the case to the Commissioner for further proceedings.

## II.  Background and Procedural History.

We refer to the transcript provided by the Commissioner. *See docs. 10-1* to

*10-7*.[1]  On July 17, 2021, Galgoci protectively filed[2] an application for disability

insurance benefits, alleging that he has been disabled since January 1, 2021.

*Admin. Tr.* at 182–90.[3]  He later filed an amended application alleging that he

became disabled on April 27, 2021. *Id*. at 191. After the Commissioner denied his

claim at the initial and reconsideration levels of administrative review, *id*. at 99–

103, 105–09, Galgoci requested an administrative hearing, *id.* at 110–11.  In June

2022, Galgoci, who was represented by counsel, as well as a vocational expert

testified via telephone at a hearing before Administrative Law Judge Daniel Balutis

(the "ALJ"). *Id*. at 34–59.  In July 2022, the ALJ denied Galgoci's claim for

---

[1] Because the facts of this case are well known to the parties, we do not repeat them here in detail.  Instead, we recite only those facts that bear on Galgoci's claims.

[2] "Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits." *Stitzel v. Berryhill*, No. 3:16-CV-0391, 2017 WL 5559918, at *1 n.3 (M.D. Pa. Nov. 9, 2017).  "A protective filing date allows an individual to have an earlier application date than the date the application is actually signed." *Id*.

[3] This is not the first application for disability benefits that Galgoci filed. *See Admin. Tr.* at 60–78 (April 26, 2021 decision of Administrative Law Judge Michelle Wolfe denying Galgoci's claim for benefits submitted in 2020).  We note that Galgoci's alleged onset date for the instant claim is April 27, 2021, the day after the decision on his prior claim.  Since Galgoci's prior claim is not relevant to the instant claim, we do not mention it further.

benefits. *Id.* at 12–33.  In so doing, the ALJ concluded that Galgoci's date last insured[4] was December 31, 2025, and his alleged onset date (as amended), *i.e.*, the date that he allegedly became disabled, was April 27, 2021. *Id.* at 15, 16.  Galgoci appealed the ALJ's decision to the Appeals Council, which denied his request for review. *Id.* at 1–6.  This makes the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.

In September 2023, Galgoci, represented by counsel, began this action by filing a complaint claiming that the Commissioner's decision is not supported by substantial evidence and is contrary to law. *See Doc. 1 ¶8*.  He requests that the court reverse the Commissioner's decision or, in the alternative, remand the case for further proceedings. *Id.* at 2 (Wherefore Clause).

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned. *Doc. 8*.  The Commissioner then filed an answer and a certified transcript of the administrative

_____

[4] "Disability insurance benefits are paid to an individual if that individual is disabled and 'insured,' that is, the individual has worked long enough and paid social security taxes." *Jury v. Colvin*, No. 3:12-CV-2002, 2014 WL 1028439, at *1 n.5 (M.D. Pa. Mar. 14, 2014) (citing 42 U.S.C. §§ 415(a), 416(i)(1)).  "The last date that an individual meets the requirements of being insured is commonly referred to as the 'date last insured.'" *Id.* (citing 42 U.S.C. § 416(i)(2)).  Here, the ALJ determined that Galgoci met the insured-status requirements through December 31, 2025. *Admin. Tr.* at 16, 18.

proceedings. *Docs. 9, 10*.  The parties filed briefs, *see docs. 11, 13, 14*, and this matter is ripe for decision.

## III.  Legal Standards.

### A. Substantial Evidence Review—the Role of This Court.

When reviewing the Commissioner's final decision denying a claimant's application for benefits, "the court has plenary review of all legal issues decided by the Commissioner." *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). But the court's review of the Commissioner's factual findings is limited to whether substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 587 U.S. 97, 99 (2019).  "[T]he threshold for such evidentiary sufficiency is not high." *Biestek*, 587 U.S. at 103.  Substantial evidence "means— and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Substantial evidence "is less than a preponderance of the evidence but more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).

But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's] finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D. Pa. 2003).

The question before this court, therefore, is not whether Galgoci is disabled, but whether substantial evidence supports the Commissioner's finding that he is not disabled and whether the Commissioner correctly applied the relevant law.

### B. Initial Burdens of Proof, Persuasion, and Articulation.

To receive benefits under Title II of the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful work that exists in the national economy. 42 U.S.C.

§ 423(d)(2)(A); 20 C.F.R. § 404.1505(a).  Further, to receive disability insurance benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).

The ALJ follows a five-step sequential-evaluation process to determine whether a claimant is disabled. 20 C.F.R. § 404.1520(a).  Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience, and residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4)(i)–(v).

The ALJ must also assess a claimant's RFC at step four. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 198 n.2 (3d Cir. 2019).  The RFC is "'that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see also* 20 C.F.R. § 404.1545(a)(1).  In making this assessment, the ALJ considers all the

claimant's medically determinable impairments, including any non-severe impairment identified by the ALJ at step two of his or her analysis. 20 C.F.R. § 404.1545(a)(2).

"The claimant bears the burden of proof at steps one through four" of the sequential-evaluation process. *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010). But at step five, "the burden of production shifts to the Commissioner, who must . . . show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity." *Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir. 2001).

The ALJ's disability determination must also meet certain basic substantive requisites. Most significantly, the ALJ must provide "a clear and satisfactory explication of the basis on which" his or her decision rests. *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). "The ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F. 3d 429, 433 (3d Cir. 1999). The "ALJ may not reject pertinent or probative evidence without explanation." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008). Otherwise, "'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Burnett*, 220 F.3d at 121 (quoting *Cotter*, 642 F.2d at 705).

7

## IV.  The ALJ's Decision.

On July 8, 2022, the ALJ denied Galgoci's claim for benefits. *Admin. Tr.* at

12–33.  He proceeded through the fourth step of the five-step sequential-evaluation

process.

### A.  Step One.

At step one of the sequential-evaluation process, the ALJ found that Galgoci

had not engaged in substantial gainful activity since the alleged onset date. *Id.* at

18.

### B.  Step Two.

At step two of the sequential-evaluation process, the ALJ found that Galgoci

had the following severe impairments: spinal stenosis with neuropathy and obesity.

*Id*. at 18.  He also found that although Galgoci had a history of cardiac

catheterization, benign hypertension, obstructive sleep apnea, gout, and diabetes

mellitus, those impairments were not severe. *Id*.

### C.  Step Three.

At step three of the sequential-evaluation process, the ALJ found that

Galgoci did not have an impairment or combination of impairments that met or

medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix

1. *Id*. at 544.  Specifically, that ALJ considered Listings 1.15 and 1.16 with respect to Galgoci spinal's issues. *Id*. at 19–20.  The ALJ also considered SSR 19-2p with respect to Galgoci's obesity.

### D.  The RFC.

The ALJ then determined that Galgoci had the RFC to do sedentary work[5] with some limitations. *Id*. at 22–27.  He concluded that Galgoci, "who uses a single point cane for ambulation, is able to carry objects in his non-cane using hand[.]" *Id*. at 22.  But he determined that Galgoci can only occasionally climb ramps and stairs, and can only occasionally balance, stoop, kneel, crouch, and crawl. *Id*.  And, the ALJ determined, that Galgoci can never climb ladders, ropes, or scaffolds, and he "must never push/pull or operate foot controls with the left lower extremity due to foot drop." *Id*.  The ALJ further concluded, however, that Galgoci could be

---

[5] *See* 20 C.F.R. § 404.1567(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.").  "'Occasionally' means occurring from very little up to one-third of the time.  Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5 (1983).

exposed to extreme cold and vibrations frequently, and he can work at unprotected

heights and in proximity to moving mechanical parts frequently. *Id*.

In making this RFC assessment, the ALJ reviewed Galgoci's assertions and

testimony:

> The claimant indicated in his application for benefits that he is
> unable to work due to spinal stenosis, foot drop, sleep apnea,
> lower extremity pain radiation, and obesity.  Because of these
> conditions, the claimant incurs limitation in his ability to lift,
> squat, bend, stand, walk, kneel, stair climb, complete tasks, and
> get along with others.  The 6'0" tall claimant weighs about 350
> pounds and is right handed.  He maintains a driver's license
> without restriction and he is able to drive an automobile.  The
> claimant limits his driving due to leg weakness and an inability
> to react quickly (thirty to forty miles is the distance limit that he
> could drive).  His girlfriend completes the shopping (he later
> acknowledged that he shopped about "a couple of months ago"
> but that he was required to lean on the cart and to take breaks).
> The claimant's left lower leg and foot hurt him daily, most
> typically by the end of the day, if he engages in increased
> activity.  He rates his current pain level as a 5 or 6 of 10.  This
> is the claimant's pain level with medication, and if he did not
> take this medication, his pain level would increase to a 7.  His
> medications cause him to incur no side effects.  He walks with a
> cane and he is limited to walking for 50 feet without resting.
> Poor balance also limits the claimant.  Standing is limited to 10
> or 15 minutes before he loses his balance and must rest (due to
> leg weakness).  If he sits for longer periods, he must switch
> positions.  Carrying objects greater than ten or 20 pounds would
> cause the claimant to lose his balance.  His hands are not
> affected by his conditions and he is able to pick up objects from
> the floor, if he is able to lean on something to maintain his
> balance.  Stooping and squatting is beyond the claimant's
> capacity.  He cannot climb a flight of stairs without difficulty
> and he struggles to do so at home.  The claimant is able to
> shower and he does so daily.  Dressing is difficult for the
> claimant, i.e. removing his socks and shoes is a problem, at

times.  He is able to perform household chores from a seated
position.  The claimant does not clean or complete yardwork.
He resides with his girlfriend and her 13-year-old daughter.  It
is difficult for the claimant to sleep, but he does not typically
take naps.  He does not know why he struggles to sleep.  In the
winter (the cold weather), causes his body to stiffen.  He has
fallen and he needs help carrying objects[.]  During a typical
day, he does very little.  The claimant generally watches
television and listens to music.  His inability to perform tasks
frustrates him.  After he was previously denied SSA benefits,
he tried to find work (this effort was unsuccessful because no
employer would accommodate his physical limitations).

*Id.* at 23.[6]  The ALJ concluded that Galgoci's "medically determinable

impairments could reasonably be expected to cause the alleged symptoms;

however, [Galgoci's] statements concerning the intensity, persistence and limiting

effects of these symptoms are not entirely consistent with the medical evidence and

other evidence in the record for the reasons explained in this decision." *Id.*

The ALJ also reviewed Galgoci's medical records. *Id.* at 24.  He noted that

on May 7, 2019 (which is prior to the alleged onset date in this case), Galgoci

"underwent a lumbar laminectomy at L1/L2/L3 with resection of the spinous

process and decompression[,]" and "[a]fter completion of physical/occupational

therapy, [Galgoci] was discharged in satisfactory condition." *Id.*  The ALJ then

summarized Galgoci's medical records from the relevant period:

In early 2021, x-ray studies showed that the claimant developed
moderately severe degenerative joint disease at L4/L5 with disc

---

[6] For readability purposes, here—and elsewhere—when citing or quoting the
ALJ's decision, we omit the ALJ's citations to the record.

> space narrowing but without fracture.  MRI studies revealed
> moderate to severe multilevel spondylosis without acute
> osseous findings.  Despite tenderness and weakness, physical
> examination findings showed that the claimant's range of
> motion was normal and that his reflexes were normal. Straight
> leg raise testing results were also normal.  Care throughout late
> 2021 and early 2022 was largely monitory in nature.  On March
> 7, 2022, the claimant reported ongoing back pain.  However, no
> acute or extreme symptomatology was noted.

*Id*.  The ALJ determined that Galgoci's statement about his symptoms were not

fully corroborated by the medical records, and he concluded that Galgoci's

"symptomatology would be reasonably accommodated by the limitation to the

range of sedentary exertional work as outlined in the established residual

functional capacity." *Id*.

After reviewing the medical records, the ALJ addressed Galgoci's activities

of daily living as set forth in his testimony and function reports:

> More specifically, he prepares simple meals (sandwiches and
> microwave foods), is able to work from a seated position, and
> shops via computer/the mail/in stores.  The claimant leaves his
> home daily and he retains the capacity to handle his financial
> affairs, including paying bills, counting change, and
> maintaining checking/savings accounts.  He enjoys watching
> television, completing craft projects, and making small repairs.
> The claimant is able to interact with others and he follows oral
> and written instructions very well.  He is able to pay attention
> and to finish that which he starts.  No limitations were noted
> with his ability to reach and to sit (no need for a sit/stand option
> was reported).  The claimant is able to cope with stress and to
> adapt to change.  He uses a cane to walk.  Dressing and
> performing his personal care needs remains within the
> claimant's residual functional capacity.  The claimant performs

> simple cleaning such as "wipping [sic] stuff off."  Paying
> attention is not a problem for the claimant.

*Id*. at 24–25.  Acknowledging that Galgoci "has some limitations performing these activities (for example, his step-daughter helps him with removing his socks and shoes)," that ALJ concluded that "while none of these activities is dispositive, taken together and considered in conjunction with the above medical evidence of record, they suggest that the claimant could perform work within the above parameters on a sustained and continuous basis." *Id*. at 25.

In making the RFC assessment, the ALJ also considered the opinion evidence in the record.  There were three medical opinions.  The ALJ first considered the medical sources statements of Jennifer Zellner.[7]

FP Zellner[8] describes her "[f]requency and length of contact with" Galgoci as "every 6 months, 15 minutes." *Id*. at 484.  She asserts that Galgoci has degenerative joint disease, hypertension, gout, sleep apnea, and spinal stenosis

---

[7] Zellner completed two medical source statements—on dated February 15, 2021, and one date November 1, 2021. *Admin. Tr.* at 552–23, 484–85.  Although these medical source statement have different dates, the body of each medical source statement is the same.  From here on out, we cite to the November 1, 2021 statement as it the most recent statement.

[8] It appears from the record that Zellner is a Physician's Assistant, Certified. *See Admin. Tr.* at 513 (medical record listing "Jennifer Zellner, PA-C").  The ALJ refers to her as "Jennifer Zellner, FP," *id*. at 25, and the parties in their briefs refer to her as FP Zellner, *see e.g. doc. 11* at 6, *doc. 13* at 9; *doc. 14* at 2.  We will refer to her as FP Zellner since that is how the ALJ and the parties refer to her.

with neuropathy, which results in symptoms of back pain, leg numbness. and weakness. *Id*.  FP Zellner concludes that Galgoci's prognosis is "Fair." *Id*.  She opines that with normal breaks, Galgoci can sit for two to four hours in an eight-hour workday, and he can stand/walk for up to one hour in an eight-hour workday. *Id*.  She also asserts that every 30 minutes Galgoci must alternate between siting and standing. *Id*.  According to FP Zellner, Galgoci can only occasionally lift/carry less than 10 pounds; he can frequently push/pull with his upper extremities, but he can never push/pull with his lower extremities; he can occasionally reach (in all directions, including overhead); he can frequently handle, finger, and feel; and he must avoid temperature extremes and hazards, such as heights. *Id*.  484–85.  She also opines that occasionally Galgoci's pain and other symptoms would interfere with his ability to maintain the attention and concentration needed to perform simple work tasks, and he would be absent four or more days per month due to his impairments and/or treatments. *Id*. at 485.  She lists drowsiness as a side effect of his medications. *Id*.  In response to the directive on the form asking her to "describe the objective findings, clinical observations, and symptomology supporting [her] assessment," FP Zellner writes: "Pt $\overline{c}$ lower extremity weakness, ↓ patellar reflexes, guarded gait, ↓ [L] Achilles reflex." *Id*.

14

After summarizing most, but not all,[9] of FP Zellner's medical source statement, the ALJ found her opinions unpersuasive:

> The undersigned finds these opinions unpersuasive, as the evidence of record, inclusive of the examination findings and the objective evidence, does not support this significant degree of limitation.  More specifically, limiting the claimant to lifting less than 10 pounds is inconsistent with the claimant's admission that he is able to lift 10 to 20 pounds, even though the undersigned limited the claimant to lifting at a sedentary exertional level.  Moreover, the claimant acknowledged that he is able to perform some work/various activities at a seated position, while these opinions indicate that the claimant is unable to sustain full time work on a competitive basis.  Also, the physical examination findings do not reflect severity that would preclude the claimant from performing all work activity.  Accordingly, because these opinions are not supported or corroborate by the evidence, i.e. they overestimate the claimant's degree of limitation, the undersigned finds these opinions unpersuasive.

*Id*. at 25–26.

The ALJ also considered the opinions of the state agency physicians—Dr. Louis Biagio Bonita and Dr. Angela Teresa Walker. *Id*. at 26.  He found the opinions of Drs. Bonita and Walker unpersuasive because they "clearly underestimate the claimant's degree of restriction" and "the evidence of record, inclusive of the physical examination findings and the objective evidence, supports a finding that the claimant incurs a greater degree of limitation." *Id*. at 26.  The

---

[9] The ALJ does not mention FP Zellner's statement regarding the objective findings, clinical observations, any symptomology for her assessment.

ALJ explained that he found the opinions unpersuasive because Galgoci "is limited in the performance of daily tasks (he does not prepare complex meals, clean, rarely shops, and limits his standing/walking)," and "the physical examination findings although not reflective of a disabling physical limitation, do[] justify restricting the claimant to the performance of a range of sedentary work from a standing, walking, lifting, and carrying perspective." *Id.*[10]

The ALJ summarized the basis for his determination that Galgoci has the RFC to perform sedentary work with limitations:

> . . . The above residual functional capacity assessment is supported by and consistent with the objective medical evidence, including the measurable findings upon clinical examination. The claimant reported complaints of multiple physical problems. The existence of his problems and resultant symptomatology are supported somewhat by the objective evidence of record, but not to the extent as alleged by the claimant. Limitations to exertional, postural, and environmental factors have been included to address the claimant's well-supported objective deficits of record. Based upon the claimant's spinal issues and ongoing obesity, restrictions to sedentary work with the opportunity to use a single point cane, in addition to climbing, stooping, kneeling, crouching, and crawling restrictions, were warranted. Moreover because of the claimant's foot drop, fall risk, and exacerbation caused by environmental factors, accommodations to hazards (heights and machinery), vibrations, cold temperatures, and left lower extremity pushing/pulling (the

---

[10] Although the ALJ found the opinions of Drs. Bonita and Walker unpersuasive, he nevertheless noted that he "does acknowledge that greater deference was paid to the opinion of Dr. Walker, as that opinion afforded the claimant increased accommodations (including to environmental factors overlooked by Dr. Bonita)." *Id.*

> operation of foot controls) were included in the established
> residual functional capacity.  The residual functional capacity is
> consistent with the claimant's activity level as indicated.  The
> objective evidence does not support a finding that the claimant
> is more severely limited than stated above.  In light of the
> evidence of record, the above residual functional capacity gives
> the claimant the benefit of the doubt but still does not preclude
> him from performing work activity.

*Id*. at 26–27.


### E.  Step Four.

At step four of the sequential-evaluation process, the ALJ found that Galgoci
could perform his past relevant work as an office clerk. *Id*. at 27.  The ALJ
observed that although the vocational expert testified that Galgoci's past relevant
work as an office clerk was classified as light work, she also testified that as
Galgoci performed that work, it falls into the sedentary exertional class. *Id*.  And
comparing Galgoci's RFC "with the physical and mental demands of this work,"
the ALJ concluded that Galgoci "is able to perform it as actually performed." *Id*.

Because the ALJ concluded at step four that Galgoci could perform his past
relevant work, the ALJ did not need to—and did not—address step five of the
sequential-evaluation process.  The ALJ concluded that Galgoci was not disabled
from April 27, 2021 (which is the alleged onset date), through the date of the
ALJ's decision on July 8, 2022. *Id*. at 28.  Thus, he denied Galgoci's claim for
benefits. *Id*.

**V.  Discussion.**

Galgoci presents one overarching claim that the ALJ failed to account for the "total limiting effects" of his severe impairments. *Doc. 11* at 1.  Within that overarching claim, Galgoci makes the following more specific claims: (1) that in making the RFC determination, the ALJ failed to account for the time he will need to be off task to manage his symptoms, *id*. at 7; (2) that the ALJ's findings that he could perform work at heights with a cane or perform the lifting, standing, and walking requirements for sedentary work were not reasonable, *id*.; (3) that the ALJ failed to acknowledge or discuss the evidence of his "guarded gait, lumbar tenderness, low Achille's reflexes, spasms, and decreased bilateral patellar reflex," *id*. at 10; (4) that the ALJ improperly used his limited activities of daily living to conclude that he had the RFC to perform to limited sedentary work. *id*. at 10–11; (5) that the ALJ failed to consider his exemplary, 34-year work history when making his credibility finding, *id*. at 13–14; and (6) that the ALJ's finding that FP Zellner's opinion was unpersuasive was improper. *Id*. at 11–13.

Galgoci's brief does not comply with the local rules of court, which require that the plaintiff's brief in a social security action include, among other things, a statement of errors setting "forth in separate numbered paragraphs the specific errors committed at the administrative level which entitle plaintiff to relief[,]" and an argument that is "divided into sections separately addressing each issue" and

18

that "set[s] forth the contentions of plaintiff with respect to each issue and the

reasons therefor." M.D. Pa. L.R. 83.40.4(b), 83.40.4(c).  Galgoci's failure to

comply with the rules made it difficult to isolate his claims.  Nevertheless, as set

forth above, we have done so.  Moreover, the Commissioner does not object that

Galgoci's brief does not comply with the rules in this regard,[11] and the

Commissioner has addressed Galgoci's claims.  Thus, we will address Galgoci's

claims in this case.


### A.  The ALJ failed to adequately articulate his reasons for finding the opinions of FP Zellner unpersuasive.

We first address Galgoci's claim regarding the ALJ's treatment of FP

Zellner's opinions.  We start with a brief overview of the regulations regarding

opinion evidence.  The regulations in this regard are different for claims filed

before March 27, 2017 ("old regulations"), on the one hand, and for claims, like

Galgoci's, filed on or after March 27, 2017 ("new regulations") on the other hand.

The new regulations applicable here have been described as a "paradigm shift" in

the way medical opinions are evaluated. *Mercado v. Kijakazi*, 629 F. Supp. 3d 260,

---

[11] The Commissioner does asserts that Galgoci's brief does not contain a "Statement of the Facts," and, thus, the court should accept his statement of the facts. *Doc. 13* at 5 n.3.  But Galgoci's brief contains a "Statement of the Case" section, which is what is required by the Local Rules. *See* M.D. Pa. L.R. 83.40.4(a).

279 (M.D. Pa. 2022).  Under the old regulations, "ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy." *Id*. at 280.  But under the new regulations, "[t]he range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis." *Id*.

Under the new regulations, the ALJ evaluates the persuasiveness of medical opinions and prior administrative medical findings using the following factors: (1) supportability, (2) consistency, (3) relationship with claimant, (4) specialization, and (5) other factors. 20 C.F.R. § 404.1520c(c).  The most important factors are supportability and consistency. 20 C.F.R. § 404.1520c(a).  As such, the ALJ must explain how he or she "considered the supportability and consistency factors for a medical source's medial opinions or prior administrative medical findings in" his or her determination or decision. 20 C.F.R. § 404.1520c(b)(2).  The ALJ may, but is not required to, explain how he or she considered the remaining three factors in determining the persuasiveness of a medical opinion. 20 C.F.R. § 404.1520c(b)(2).

Supportability and consistency are defined in 20 C.F.R. § 404.1520c(c).  As the regulation provides, supportability means: "The more relevant the objective

20

medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).  "Simply put, supportability is an inquiry geared toward assessing how well a medical source supported and explained their opinion(s)." *Acosta Cuevas v. Commissioner of Social Security*, No. 20-CV-0502, 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021*), adopting report and recommendation*, 2022 WL 717612, at *1 (S.D.N.Y. Mar. 10, 2022).  On the other hand, consistency means: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).  The consistency factor focuses on "how well a medical source is supported, or not supported, by the entire record." *Acosta Cuevas*, 2021 WL 363682, at *10.  Against this backdrop, we address the ALJ's consideration of FP Zellner's opinions.

Here, as to supportability, the ALJ does not even mention the reasons that FP Zellner set forth in her medical source statement for the limitations that she opined Galgoci experiences.  In response to the directive on the form asking her to "describe the objective findings, clinical observations, and symptomology

supporting [her] assessment," FP Zellner writes: "Pt c̄ lower extremity weakness,

↓ patellar reflexes, guarded gait, ↓ [L] Achilles reflex." *Admin. Tr.* at 521.  The

ALJ does not refer to that explanation when addressing the persuasiveness of FP

Zellner's opinions.  In fact, he does not mention or cite to that portion of FP

Zellner's medical source statement at all in his opinion.  Because the ALJ did not

address FP Zellner's explanation for her opinions, he has not adequately explained

his conclusion regarding the supportability of FB Zellner's opinions.

The ALJ's analysis as to consistency is also lacking.  Addressing FP

Zellner's opinion that Galgoci can occasionally lift/carry less than 10 pounds, the

ALJ asserts that "limiting the claimant to lifting less than 10 pounds is inconsistent

with the claimant's admission that he is able to lift 10 to 20 pounds, even though

the undersigned limited the claimant to lifting at a sedentary exertional level." *Id.*

at 25.  Galgoci asserts that the ALJ mischaracterized his testimony regarding what

he could lift.  When the ALJ asked how much weight he was able to comfortably

lift and carry, Galgoci testified:

> I -- very little, it seems like no matter what I try to carry,
> like even stuff around the house, you know, a plate of food, I
> have to be -- just something like that, it isn't a problem like
> something that might weigh a few pounds, but anything of any
> size, is you know, anything over, I'd say, you know, 10, 20
> pounds, I really have an issue keeping my balance if I don't
> have something to lean against.

*Id*. at 46.  Galgoci asserts that while FP Zellner's assessment was about what he could lift/carry in the context of an eight-hour workday, and it is not inconsistent to say that someone who may rarely be able to lift 10 to 20 pounds could only occasionally (meaning up to one-third of an eight-hour workday) lift less 10 pounds.  Galgoci's argument in this regard is not without some force, but it is not his strongest argument for why the ALJ's consistency analysis was flawed.

Sitting is the crux of a sedentary job.  And the ALJ's analysis regarding FP Zellner's opinions regarding Galgoci's ability to sit is flawed.  Recall, FP Zellner opined that with normal breaks, Galgoci can sit for two to four hours in an eight-hour workday, and he must alternate between siting and standing every 30 minutes. *Id*. at 484.  The ALJ addressed FP Zellner's opinion about Galgoci's limitations regarding sitting merely by observing that "the claimant acknowledged that he is able to perform some work/various activities at a seated position, while these opinions indicate that the claimant is unable to sustain full time work on a competitive basis." *Id*. at 25.  As Galgoci's argues, the fact that he can do some work/activities while seated, simply is not inconsistent with FP Zellner's opinion regarding his sitting ability during an eight-hour workday.  And the ALJ did not

address at all FP Zellner's opinion that Galgoci' must alternate between sitting and standing every 30 minutes.[12, 13]

When addressing FP Zellner's opinions, the ALJ also asserts that "the physical examination findings do not reflect severity that would preclude the claimant from performing all work activity." *Id*. at 25.  The question is not,

---

[12] In another portion of his decision, that ALJ does say that Galgoci noted no limitations in his ability "to sit (no need for a sit/stand option was reported)." *Admin. Tr.* at 24.  In support of that assertion, that ALJ cited the first Function Report submitted by Galgoci. *Id*. (citing B6E).  In that first Function Report, Galgoci did not check the box on the form indicating that his injuries or conditions affect his sitting. *Id*. at 253.  But on a later Function Report, he did check the box on the form indicating that his injuries or conditions affect this sitting. *Id.* at 272. And he testified at his hearing that that he has trouble sitting and he must change positions. *Id*. at 45.  Moreover, FP Zellner opined that Galgoci must alternate between sitting and standing every 30 minutes, which opinion the ALJ did not address.

[13] FP Zellner also opined that Galgoci can only stand/walk for up to 1 hour in an 8-hour workday, that he must avoid temperature extremes and hazards, such as heights, that occasionally Galgoci's pain and other symptoms would interfere with his ability to maintain the attention and concentration needed to perform simple work tasks, and he would be absent four or more days per month due to his impairments and/or treatments. *Id*.  484–85.  Galgoci asserts that the ALJ failed to account for the time he would be off-task to manage his symptoms, and that the ALJ did not reasonably conclude that he could perform at heights or perform the standing and walking requirements of sedentary work. *Doc. 11* at 7.  But Galgoci does not specifically argue that the ALJ failed to discuss the opinions of FP Zellner as to these issues.  Rather, Galgoci addresses the ALJ's discussion of FP Zellner's opinions by addressing what the ALJ said, not what he failed to say.  We note, however, the ALJ did not discuss FP Zellner's opinions regarding Galgoci's limitations regarding standing/walking, avoiding temperature extremes and hazards, or the time he would miss work.

Case 1:23-cv-01530-SES   Document 15   Filed 08/19/24   Page 25 of 28

however, whether Galgoci is precluded from all work activity, but whether he has an "inability to engage in any substantial gainful activity." 42 U.S.C. § 423(d)(1)(A).  Where an ALJ otherwise adequately articulates his or her reasoning, an error in stating the disability standard does not necessarily require reversal. *Vega v. Comm'r of Soc. Sec.*, 358 F. App'x 372, 376 (3d Cir. 2009) (concluding that "[a]lthough the ALJ may have been imprecise when he stated that 'there [was] no indication from [Vega's] treating physician that her limitations would preclude all work activity,' . . . this error does not require reversal" and observing that the ALJ's "finding that Vega was able to continue substantial gainful activity, which is the proper legal standard, is supported by the record"). But here, as set forth above, the ALJ has not sufficiently articulated his reasoning for rejecting the opinions of FP Zellner.  And, as Galgoci points out, in support of his assertion that the physical examination findings do not preclude Galgoci from all work activity, the ALJ cites two full exhibits, without citation to specific parts of those exhibits and without a discussion as the particular evidence on which he was relying.  The ALJ's conclusory assertion that the physical examination findings do not preclude Galgoci from all work activity does not shed light on the basis for the ALJ's rejection of FP Zellner's opinions.

In sum, although that ALJ concluded that FP Zellner's opinions "are not supported or corroborate[d] by the evidence, i.e., they overestimate the claimant's

degree of limitation," he has not sufficiently explained why that is so.  Specifically, he has not adequately addressed the supportability and consistency of FP Zellner's opinions.  Thus, we cannot say that substantial evidence supports the ALJ's decision.

### B.  Other Claims.

Because we conclude that the Commissioner's decision must be vacated and the case remanded based on the ALJ's failure to sufficiently articulate why he found FP Zellner's opinions unpersuasive, we will not address Galgoci's remaining claims of error.  "Plaintiff's additional claims of error may be remedied through the case's treatment on remand." *Brown v. Saul*, No. CV 3:18-1619, 2020 WL 6731732, at *7 (M.D. Pa. Oct. 23, 2020), *report and recommendation adopted*, 2020 WL 6729164, at *1 (M.D. Pa. Nov. 16, 2020).  "A remand may produce different results on these claims, making discussion of them moot." *Id*.

### C.  Remand is the appropriate remedy.

Because the ALJ's decision is not support by substantial evidence, the question then is whether the court should remand the case to the Commissioner for further proceedings or award benefits to Galgoci, as he suggests. *See doc. 1* at 2 (requesting that the court reverse the Commissioner's decision or, in the

alternative, remand the case for further proceedings).  We conclude that remand is the appropriate remedy.

Under sentence four of 42 U.S.C. § 405(g), the court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  Thus, although a remand is often the appropriate remedy, the court may also enter an order awarding the claimant benefits. *See Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 358 (3d Cir. 2008) (remanding the case to the district court with directions to enter an order awarding the payment of benefits); *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000) (same); *Podedworny v. Harris*, 745 F.2d 210, 223 (3d Cir. 1984) (same).  But an "award [of] benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221–22.  Whether there has been excessive delay and/or prior remands also bears on whether to award benefits or to remand for further proceedings. *Diaz v. Berryhill*, 388 F. Supp. 3d 382, 391 (M.D. Pa. 2019).  "Thus, in practice any decision to award benefits in lieu of ordering a remand for further agency consideration entails the weighing of two factors: First, whether there has been an excessive delay in the litigation of the claim which is not attributable to the

27

claimant; and second, whether the administrative record of the case has been fully developed and substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Id*.

Here, there has not been excessive delay in the litigation of Galgoci's claims, and we cannot say that substantial evidence on the record as a whole shows that Galgoci is disabled and entitled to benefits.  Thus, we will remand the case to the Commissioner for further proceedings.

## VI.  Conclusion.

For the foregoing reasons, we will vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).  An appropriate order follows.

*S/Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge